OPINION OF THE COURT
Eugene L. Nicandri, J.
RELIEF SOUGHT
Plaintiff moves for summary judgment (CPLR 3212) or alternatively for a trial as to damages.
*458 Defendant cross-moves for an order dismissing the complaint for failure to state a cause of action.
The complaint alleges a mutual mistake involving the transfer of certain real property for the price of $200,000 and seeks to reform the purchase price and purchase-money mortgage given to the seller to secure the balance of the purchase price.
The answer denies certain allegations in the complaint, and sets forth three alternative defenses — (1) no mutual mistake; (2) Statute of Limitations; and (3) monetary jurisdictional limitation of County Court.
FACTUAL BACKGROUND
On October 14, 1983, H. Styles Bridges, Eugene LeGault and Thomas S. Bixler, Jr. executed an offer to purchase real property in the Towns of Parishville and Colton, St. Lawrence County, owned by defendant Cold Brook Sand and Gravel Corporation (hereafter called Cold Brook). The offer was accepted by defendant Cold Brook on October 17,1983.
The offer described the real property as — "a parcel of land containing approximately two thousand (2,000) acres, more or less of land,” and being a portion of the premises obtained by the seller in 1971.
The purchase offer then more specifically purports to describe the parcel to be conveyed as — "the premises formerly under lease to the Brunner Hill Club, as posted, and presently marked by orange blazes, a description of which is attached hereto and made a part hereof (purchase offer) marked as 'Exhibit A: ”
Exhibit A referred to in the purchase offer reads: "All that certain tract, piece, parcel of land owned by the grantor lying Southerly of the hereinafter described boundary line and Westerly of New York State Route 56: beginning at a point on the Westerly edge of the right-of-way of New York State Route 56 (marked by a metal stake) where the same is intersected by a painted red-orange line, said point lying approximately 180 feet Northerly of the middle of an access road and running thence in a general Westerly direction to the Easterly boundary of property owned by Long Pond Timber Company and presently being leased by the Birch Brook Hunting Club, being and intending to describe the same premises formerly leased to Brunner Hill Club.”
The purchase agreement establishes the purchase price for the parcel to be conveyed at $200,000, "not allocated to *459 specific acreage, but the whole referenced property”. It then provides for a purchase-money mortgage of $160,000 with the seller as mortgagee. Seller was to convey title by bargain and sale deed with covenant against grantor.
The agreement provides that the buyers have inspected the property, have offered to purchase as a result of such inspection and "not because of any representations made by Seller”.
The agreement further reflects the assignability of purchasers’ interest to a corporation to be formed, to wit — "Little Stillwater Holding Corporation”, the plaintiff (hereafter called Little Stillwater).
By warranty deed dated December 21, 1983, defendant Cold Brook transferred to Little Stillwater the parcel of land as described on exhibit A to the purchase agreement.
The rental agreement between defendant Cold Brook and the Brunner Hill Club (1974) describes the leased property— "of approximately 2,000 acres of our land (meaning all cold brook land with the exception of that which used to be called 'Huggard Farm’).”
In 1989, plaintiff Little Stillwater contracted to purchase an additional 560-acre parcel of defendant’s remaining land. At that point in time, it appears plaintiff had this second parcel surveyed as well as the 1983 acquisition. That survey of May 1989 revealed the actual acreage for the 1983 purchase by plaintiff to be 1,455 acres, inclusive of 0.973 acres conveyed to the State of New York for highway purposes. The survey also discloses that various boundaries accepted by the surveyor were already marked by paint blazes or iron pipes as found monuments.
No complaint was made by plaintiff from 1983 to 1989, or until the survey was completed. Thereafter, plaintiff sought from defendant either additional acreage or a price adjustment based on $100 per acre for 545 acres, or $54,500, plus interest. The acreage discrepancy is of 37% magnitude.
Plaintiff relies upon the deposition of officers/members of defendant Cold Brook, tax bills, and correspondence from St. Lawrence County Tax Mapping Department to establish that defendant believed it owned 2,564 acres. It also relies upon the 1983 closing statement and the deposition of defendant’s agents that defendant also believed it was transferring to plaintiff 2,000+ acres.
Defendant on the other hand relies upon the various descriptions and references in the purchase agreement, deed, *460 and leases to show its intent to transfer the Brunner Hill Club property. Also in support of that conclusion it relies on the various disclaimers as to representations in the purchase agreement as to specific acreage and the absence of any per-acre negotiation or agreement and the lump-sum application of the purchase price to the Brunner Hill lease.
APPLICABLE LAW
County Court has original subject matter jurisdiction over this action. (Judiciary Law § 190 [1].)
As a general proposition, courts of equity may reform a contract for the sale and purchase of real property in the event of a mutual mistake. (See generally, 62 NY Jur, Vendor and Purchaser, § 171.) The distinctions between actions at law and suits in equity have, of course, been abolished with the merger of the various forms of action. (CPLR 103 [a].)
When there is a deficiency in the acreage conveyed, arising as a matter of mutual mistake, rather than fraud, the court must examine the contract in order to understand the intent of the parties as expressed in their agreement, in order to determine whether or not to allow reformation or recovery for a shortage in the acreage conveyed. For example, in Paine v Upton (87 NY 327 [1882]) the court considered whether or not a purchaser was entitled to an abatement of price proportionate to the deficiency in acreage of a working farm, where the shortage was attributable to a mutual mistake. In that case, the court described the acreage as a material element of the contract, but specifically grounded this finding on the fact that agricultural land was involved: “In the absence of any finding of special facts and circumstances, the natural presumption is, that in a sale of agricultural land, the element of quantity enters into the transaction, and affects the consideration agreed to be paid. But in this case it is plain, that the representation of quantity was deemed material by the parties.” (87 NY, supra, at 331 [emphasis added].)
That acreage is not always a material element of the transaction was made clear by the same court five years later in Case v Dexter (106 NY 548, 554 [1887]), when it held that ”[v]ariance between actual and estimated quantity of land is not usually a material circumstance, but it may in some cases be an important element in determining the intention of the parties to the grant.”
Here the contract called for acreage of 2,000 acres more or *461 less, but specifically disclaimed that price was attributable to specific acreage and further required that the seller transfer title according to the description attached as exhibit A to the contract. This the seller in fact did. Neither exhibit A to the contract, nor the deed itself made any representation as to acreage, as previously noted.
Furthermore, the survey later performed by purchasers disclosed preexisting monuments in the form of blazes and pipes. It is a long-standing rule that estimates of acreage will yield to permanent and natural monuments. (See generally, Jackson v Moore, 6 Cow 705 [1827]; Thayer v Finton, 108 NY 394 [1888]; Baldwin v Brown, 16 NY 359 [1857]; see also, Hibiscus Harbor v Ebersold, 63 AD2d 824 [4th Dept 1978].) Furthermore, the purchase was in a position either to request a survey or condition its offer upon certain acreage, had it wished to do so. This is made especially clear by Little Stillwater’s decision, some six or seven years after the transaction, to do so. The courts are reluctant to reform a contract for the parties if they had the means available to them to ascertain the facts upon which they intended to rely prior to going forward with the transaction. (Schumaker v Mather, 133 NY 590, 596 [1892], where the court held that, " T think the general rule is that if the facts represented are not matters peculiarly within the party’s knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations. ’ ”)
Moreover, the purchase contract clearly states that the buyers had inspected the property and offered to purchase it as a result of the inspection and not in reliance on any representation by the seller. This is consistent with the testimony of H. Styles Bridges, one of the purchasers who assigned his interest to plaintiff, when he testified at the examination before trial, that he had traveled to the property and fished on the pond there. He further testified that he had hunted on the property each year thereafter through and including 1989. He also had traveled the property before the purchase offer was signed and had some familiarity with boundary lines, though less so than he claimed at the time of examination before trial.
The combined effect of these provisions and of the testimony *462 of plaintiffs assignor is a specific disclaimer of any representation as to acreage. The court will generally uphold such specific disclaimers in a purchase contract. (Danann Realty Corp. v Harris, 5 NY2d 317 [1959]; Sylvester v Bernstein, 283 App Div 333 [1st Dept 1954], affd 307 NY 778.) Although Danann was grounded in fraud, rather then mutual mistake, much of the language is relevant to the case at bar. The purchasers are presumed to have read the agreement and understood it. In Danann, as here, there was no allegation that the purchasers misunderstood the language in the agreement, or that there was any fraud in the procuring of that language. "It would be unrealistic to ascribe to plaintiffs officers such incompetence that they did not understand what they read and signed.” (5 NY2d, supra, at 321.)
Clearly in this case there was a mutual mistake as to the actual acreage. Equally clear, the parties entered an agreement describing the boundaries of the parcel to be conveyed in terms that were meaningful to both parties based upon an actual inspection of the premises, and based upon reference to stated boundaries. In this situation, and in light of the specific language of the purchase contract, the statement of estimated acreage is not such a material element of the transaction as to entitle the purchasers to reformation of the contract or to an abatement of price. Clearly this was intended as a sale in gross, not by the acre.
As the Court of Appeals stated in Backer Mgt. Corp. v Acme Quilting Co. (46 NY2d 211, 219 [1978]): "Reformation is not granted for the purpose of alleviating a hard or oppressive bargain, but rather to restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties * * * Equity evolved the doctrine because an action at law afforded no relief against an instrument secured by fraud or as a result of mutual mistake * * * [T]o overcome the heavy presumption that a deliberately prepared and executed written instrument manifested the true intention of the parties, evidence of a very high order is required * * * And well that it is, for freedom to contract would not long survive courts’ ready remaking of contracts that parties have agreed upon * * * All the more so when a litigant seeks to invoke the power of the court, not merely to sever the contractual relationship between the parties, but, as here, to continue that relationship in a modified form. It follows that a petitioning party has to show in no uncertain terms, not only that mistake or fraud *463 exists, but exactly what was really agreed upon between the parties (Williston, Contracts [3d ed], §§ 1548,1597)”.
Here it seems to the court that what the seller conveyed is what was contracted for and that the mutual mistake as to estimated acreage affords the plaintiff no relief.
Motion for summary judgment or trial as to damages denied, and cross motion for dismissal of the complaint granted, without costs.